UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
SOUTHEASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff(s), | ) | |
| | ) | |
| vs. | ) | Case No. 1:08CR 73 JCH |
| | ) | |
| PRINCE BLACK, | ) | |
| | ) | |
| Defendant(s). | ) | |

## REPORT AND RECOMMENDATION

### Procedural Background

The defendant filed Defendant's Motion to Suppress Evidence and Statements (Document #19). The government filed its Response (Document #21). Two hearings were held and the parties filed post-hearing memoranda.

### Factual Background

In mid-February, 2008, the residence of Pemiscot County Deputy Ron Warren was burglarized. Items taken in that burglary were several handguns and some jewelry. Several law enforcement officers in Caruthersville were aware of the burglary and assisted in that investigation. ATF Special Agent Ryan Becker also provided some assistance.

On February 20, 2008, Pemiscot County Deputy Sheriff Eddie Holloway received information from a confidential source that Prince Black (defendant) was in possession of several weapons and some jewelry that was stolen from the Warren home. The confidential source stated that the stolen items were located in Black's girlfriend's apartment. That girlfriend's name was Jacqueline Grant (also referred to as Jackie Grant). She lived at the Slentz Apartments in Caruthersville, Missouri,

located at 309 Highland, specifically in Apartment Number 2.

Holloway knew Black before this time, having previous law enforcement contact with him. Holloway knew that Black was previously convicted of felony offenses, including robbery and distribution charges, and believed that Black had been involved in other burglaries and robberies. Holloway was also aware that two people had stated that they purchased drugs from Black three days prior to February 20, 2008, and that Black shot at their car as they drove away. (Tr. I, p. 8).[1]

After receiving the information from the confidential source about the firearms, Holloway and several other officers decided to go to Jacqueline Grant's apartment. They planned to secure the apartment, locate Ms. Grant, and ask for her consent to search the apartment. Holloway, Caruthersville Police Officer Michael Coleman and Deputy Marcus Hopkins went to the front door of Apartment 2. Police Chief Chris Riggs went to the back entrance to the apartment. (Tr. I, P. 8, 9, 110; Tr. II, p. 15, 16).

After approaching the door, Holloway looked in the door's window. The window ran most of the length of the door. Holloway testified that the window was open with a border of curtain on each side. Holloway looked to the left in the apartment and observed Prince Black lying asleep on a sofa. Holloway could also see the handle of a revolver on Black's chest. Holloway then stated to Coleman, "Prince is on the sofa and it looks like a gun on him." Holloway checked the door and found that it was unlocked. At that time, Holloway knew that Black was prohibited from possessing firearms because of his felony convictions. Holloway testified that he believed that it would be more dangerous to leave Black behind while he obtained a search warrant, because of Black's violent

---

[1]Since there were two hearings, reference to pages of the transcript from the hearing of July 30, 2008, will be preceded by Roman numeral I. Reference to pages from the transcript of the August 11, 2008, hearing will be preceded by Roman numeral II.

history. He believed that Black was more dangerous left there with a gun. Holloway entered the apartment with Coleman close behind. Hopkins followed a short time later. Black was arrested and the firearm was seized by Coleman. The revolver was one stolen during the Warren burglary. The officers observed a quantity of ammunition on the floor near Black. Black was escorted out of the apartment. Other officers "swept" the apartment, looking for other persons. When no one else was found, all officers left the apartment. No other search was conducted at that time nor was the ammunition lying in plain view seized at that time.

ATF Special Agent Ryan Becker came to the apartment after Black had been arrested. He had been looking in Caruthersville for Jacqueline Grant. Black had been placed in a patrol car by this time. Becker asked Black if he would give his permission to search the apartment. Black responded that (1) it wasn't his apartment; (2) Becker would have to speak with (Jacqueline) Grant about any search; (3) anything inside the apartment was his; and (4) Jackie (Grant) didn't know anything about it. Apart from the request to search the apartment, Becker had not asked any other questions of Black prior to Black's statements about the items in the apartment being his and Jacqueline Grant's knowing nothing about them. Becker continued to try to locate Jacqueline Grant. Jacqueline Grant came to the apartment and made contact with Becker. Becker informed Grant as to what had occurred prior to Grant's arrival at the apartment. Becker then asked Grant for her consent to search her apartment and received verbal consent. Becker asked Grant to step inside the apartment. Grant agreed to the search and signed a form acknowledging that consent. The apartment was searched by the officers. Other items were found and seized by the officers during that search.

## Discussion

In his Motion to Suppress Evidence and Statements, the defendant seeks the suppression of any physical evidence seized from his person or possession on February 28, 2008, and any statements obtained from the defendant in response to interrogation while in custody.

In support of his motion to suppress, the defendant argues:

(1)    It was factually impossible for police to see what they claimed they saw when they looked through the window of the front door to the apartment rented by Jacqueline Grant and where Prince Black was sleeping on a couch.

(2)    Even if the officers were able to see the defendant through the window, their entry into the apartment without a search warrant is presumed to be illegal unless the officers met an exception to the warrant requirement.  The defendant argues that there were no exigent circumstances as proposed by the government.  Even if there were exigent circumstances, that exception is not available to the police because they created the exigent circumstances by failing to obtain a search warrant or an arrest warrant.

(3)    The written consent to search of Jackie Grant was involuntary.

(4)    Any statements made by the defendant were made while he was in custody without any Miranda warnings having been given.

The factual dispute recognized by both parties is whether Pemiscot County Deputy Eddie Holloway and Caruthersville, Missouri, Police Officer Michael Coleman were able to observe the defendant, Prince Black, lying asleep on a couch in the front room of the apartment through the window in the front door.  The officers testified that they did see Mr. Black on the couch sleeping with a pistol on his chest. The handle of the pistol, a revolver, was showing.  The officers entered the

apartment.

The factual dispute arises because Jacqueline Grant, the renter of the apartment, as well as Gloria Black, the defendant's mother, and Juliet Grant, Jacqueline Grant's sister, all testified that the window through which the officers claimed they saw the defendant, was covered by a full-length curtain, blinds and a blanket which hung covering the window, both for privacy and to keep out the sunlight.[2]

The testimony of the two officers, Holloway and Coleman, is directly opposed to and contradicted by that of Jacqueline Grant, Gloria Black and Juliet Grant, who maintain that with the coverings on the front door to the apartment a person on the outside could not see into the apartment.

In its post-hearing memorandum, the government has engaged in an extensive discussion of the credibility of Gloria Black, Jacqueline Grant and Juliet Grant, supported by references to the transcripts of the two hearings. The government points out that Jacqueline Grant has been in a girlfriend-boyfriend relationship with Prince Black and at the time of the first hearing was getting along "pretty good" with the defendant, that she made weekly visits to the jail and that she put money in his jail commissary account.

Gloria Black is the defendant's mother. Both she and Jacqueline Grant (defendant's girlfriend) have previously felony convictions. One of Jacqueline Grant's felony convictions was for assaulting a police officer, Michael Coleman, one of the officers involved in the case.

Juliet Grant is the sister of Jacqueline Grant and often brings her children to Jacqueline Grant's apartment for Jacqueline to babysit the children. When she saw the officers on the night of

---

[2]One wonders why a resident would want to keep the sunlight with its accompanying heat from coming in on a winter's day, February 20th, through what was described as the only window in the apartment.

February 20, 2008, at the apartment, she asked the officers if they had a search warrant.

Although the relationship which Jacqueline Grant, Gloria Black and Juliet Grant have to the defendant or to each other does not automatically disqualify them from being credible witnesses, it could provide some bias in favor of the defendant.

The government points to inconsistencies in the three ladies' testimony as showing a lack of credibility. Gloria Black testified that her son, Prince Black, resided at Jacqueline Grant's apartment. Jacqueline Grant testified at first that Black did not live at her apartment. In fact, she had called the police to have Prince Black removed from her apartment three days before February 20, 2008. Jacqueline Grant testified that Prince Black did not have his clothes in her apartment nor any of his belongings in her apartment. She said that Prince Black lived at his mother's, Gloria Black's, apartment next door. The defendant did not receive any mail at Jacqueline Grant's apartment nor did he pay any of her rent, utilities or phone bill. He did not even have a key to Jacqueline Grant's apartment.

The importance of where the defendant, Prince Black, resided is not to show whether the defendant has standing to object to officers' entering Jacqueline Grant's apartment since, as will later be pointed out, he was an overnight guest, which gave him an expectation of privacy. Minnesota v. Olson, 495 U.S. 91, 110 S.Ct. 1684 (1990). The importance of the difference in the testimony of Gloria Black and Jacqueline Grant about where Prince Black lived or stayed is that they were not both correct. One of them was not testifying accurately.

The government reviewed in its post-hearing memorandum the differences in the testimony of Gloria Black, defendant's mother, and Jacqueline Grant about how Gloria Black entered the apartment of Jacqueline Grant. Gloria Black stated she entered by the front door. Jacqueline Grant

testified that the front door was locked and that she told Gloria Black to enter from the back entrance which was open. The difference is significant because Gloria Black, the mother, said she came in the front door just as the officers were entering the front door.

There was a difference in the testimony of Jacqueline Grant and Juliet Grant, her sister, about whether the front door to the apartment was always locked when Jacqueline Grant left the apartment, as Jacqueline Grant, the resident, testified was the case when she left on February 20th. Jacqueline Grant testified that she never left the front door unlocked. Juliet Grant testified that the door to the apartment was unlocked when the police entered. She testified further that sometimes Jacqueline would leave her front door open when Juliet Grant was bringing her children to the apartment if Jacqueline were next door at another apartment or down the street. Whether the front door was locked or not locked is significant because the officers entered the apartment through a door which they said was unlocked.

As the government points out, Gloria Black, the mother, testified that Juliet Grant, Jacqueline's sister, did not appear at the first hearing on the suppression motion because she had been prevented from coming by the actions of Caruthersville Police Chief Chris Riggs. Gloria Black testified that Riggs put Juliet Grant in jail on a driver's license offense. Gloria Black stated that Juliet Grant told Chief Riggs that she needed to go to court to testify but that the chief put her in jail anyway.

Juliet Grant did come to the second hearing on August 11, 2008, in response to the government's subpoena. Juliet Grant testified that no one prevented her from attending court at the first hearing on July 30, 2008. She did not attend court because she had a job orientation that morning and did not have a person to take care of her children during the hearing. It appears that the

testimony of Gloria Black was false.

The lack of reliability in Jacqueline Grant's testimony appears during from her testimony about how Prince Black got into her apartment on the night before his arrest. When asked how the defendant entered her apartment, Jacqueline Grant testified that "probably his mom, because his mom was there when the police came." When asked if it was fair to say she did not invite Mr. Black to be in her apartment on the night before the arrest took place, Jacqueline Grant responded, "Right." Jacqueline Grant testified further that she did not have any idea how Mr. Black got in. Later in her testimony she was asked whether somebody let Prince Black into her apartment before the police came. Jacqueline Grant stated, "Prince was already there before they came. I was there." When asked how Prince Black got in, Jacqueline Grant replied, "He came over. I was up and I was there. Actually he had stayed all night and was up." She was then asked, "And you'd let him in that night before?" She replied, "Yes, sir." (Tr. I, p. 106-107). Obviously, as the government points out, Jacqueline Grant spoke falsely when she testified earlier that she did not know how Prince Black got into her apartment.

Jacqueline Grant testified that she did not see any ammunition in the apartment. She did not see a pistol. She had testified elsewhere that Prince Black was sleeping when she left the apartment. Again, when she testified in a contradictory way about how Prince Black got into the apartment, she stated that she was present when the police came. There has been no dispute that when the police came there was a pistol resting on Prince Black's chest while he slept. Government's Exhibit #9 introduced at the second hearing showed the ammunition consisting of numerous shells lying on the floor next to the sofa where Prince Black slept. Again, it appears clear that Jacqueline Grant did not tell the truth when she testified that she did not see any weapons or ammunition. Deputy Eddie

Holloway testified that it was he who took the picture of the ammunition depicted in Government's Exhibit #9. (Tr. II, p. 58). Holloway testified that he had not made any alterations to the appearance of the ammunition before the photograph was taken and that the ammunition was in the same position it was in when he first entered the apartment. Id. Holloway testified that all the other officers left the ammunition alone.

The government points in its post-hearing memorandum to the written statement given by Jacqueline Grant on the day Prince Black was arrested, February 20, 2008, in which she wrote "None of the guns or ammo that were in this house (mine) belong to me, the big black bag that was found in my living room belonged to Prince and the smaller one was the one Bo had all the guns in--when I first saw them." (Government's Exhibit #4).

The court finds that the testimony of Jacqueline Grant, Gloria Black and Juliet Grant, that the window on the front door of the apartment was covered by various blankets, drapes and blinds so that the officers could not have seen into the apartment, is unreliable and without credibility.

An additional indicator that the interior of Jacqueline Grant's apartment was visible when the officers approached the door and looked into the window is contained in Government's Exhibit #8, the photograph of the front door of the apartment, which was entered into evidence at the second hearing on August 11, 2008. Eddie Holloway took that picture and testified that neither he nor any other officers made any alterations to the front of that apartment before the photo was taken. Holloway testified that that photograph was taken on the day Prince Black was arrested, February 20, 2008. That same photograph shows the goose referred to in various testimony (as a "duck") as being on the side of the front door on the day the police arrested Prince Black. The photograph of the front door of the apartment showing a blanket covering the window and offered at the first

hearing as Defendant's Exhibit #1 was taken on July 17, 2008, by the investigator for the Public Defender's Office. It does not show the goose.

The picture taken by Holloway appears to show no covering on the window in the front door. The court says "appears" because the door is open and thus at an angle and although no covering is shown on the window, it is possible that in a clearer picture a covering would be visible. The Holloway picture taken on February 20th, 2008, was not taken to prove or disprove a covering because there is no indication in any of the evidence that on February 20th a claim was made that the window was covered. No witness for the defendant has disputed that a pistol was resting on the defendant's chest while he slept, the reason given for the officers' immediate entry.

The principal reason the court accepts the testimony of the officers over the opposing testimony of Gloria Black, Jacqueline Grant and Juliet Grant is not Holloway's picture but the lack of credibility of the defendant's mother and the Grant sisters.

The court accepts the testimony of Officers Holloway and Coleman, that they were able to see into the apartment from the front door through the window in the front door when they first approached Jacqueline Grant's apartment on February 20, 2008. They saw at that time Prince Black lying on the sofa sleeping with a pistol, its handle showing, resting on the defendant's chest.

## Exigent Circumstances

The Fourth Amendment's prohibition of warrantless searches is not absolute. The United States Supreme Court has crafted a few carefully drawn exceptions to the warrant requirement to cover situations where "the public interest require[s] some flexibility in the application of the general rule that a valid warrant is a prerequisite to a search." Arkansas v. Sanders, 442 U.S. 753, 759, 99 S.Ct. 2586 (1979). One such exception is that the police may enter private premises and conduct a

search if "exigent circumstances" mandate immediate action.  See Michigan v. Tyler, 436 U.S. 499, 509, 98 S.Ct. 1942, 1949-50 (1978).  The exception encompasses several common situations where resort to a judge for a search warrant is not feasible or advisable including danger of flight or escape, loss or destruction of evidence or risk of harm to the public or the police.  See Johnson v. United States, 333 U.S. 10, 14-15, 68 S.Ct. 367 (1948) (listing situations falling within the exigent circumstances exception).

The circumstances in Prince Black's situation involved exigent circumstances, namely danger of harm to public or officers.  The Supreme Court stated in Warden v. Hayden, 387 U.S. 294, 298-99, 87 S.Ct. 1642 (1967), "The Fourth Amendment does not require police officers to delay in the course of an investigation if to do so would gravely endanger their lives or the lives of others." [3] Deputy Eddie Holloway testified, "When I knocked on the door, I could see Prince Black laying on the couch with the gun on his chest.  And I knew he was violent and had a criminal history, and that's when I decided to go in and secure him."  (Tr. I, p. 30).  When asked how he knew Prince Black was violent, Holloway replied, "From his criminal history, information we received from other informants, and information we received from people on the street."  Id.

When asked if he could not have backed off at that point and gone and gotten a search warrant, Holloway responded that, yes, the officers could have and continued, "The reason I didn't back out, I believe he would be more of a threat left there alone with that gun."  Id.  Holloway was aware that just three days prior to February 20, 2008, Prince Black had shot at drug buyers as they drove away from his house.

---

[3]The Court continued, "Speed here was essential and only a thorough search of the house for persons and weapons could have insured that Hayden was the only man present and that the police had control of all weapons which could be used against them or to effect an escape."  Id.

With reference to whether the officers should have backed off and sought a search warrant, what the Eighth Circuit Court of Appeals stated in United States v. Vance, 53 F.3d 220 (8th Cir. 1995), is applicable. In that case, the officers employed a protective sweep when a person was seen in a house which officers had been informed contained a wanted felon (Vance) in the company of other felons. Vance was armed and stated he would not return to prison. After Vance was arrested outside the house, an unknown second person was seen in the house. That other person then came out of the house. It was at that point that an officer accompanied that other person (Sheid) to get identification but also a second officer conducted a protective sweep. During the sweep, evidence, including drugs and other contraband, were discovered in the house in plain view. Vance moved for the suppression of the evidence claiming that the evidence was the fruit of an unconstitutional warrantless entry of the home. The Court of Appeals found that the warrantless entry was justified to protect the safety of the officers. Vance had argued that the officers could have eliminated all of their safety concerns simply by leaving the area. The Eighth Circuit stated, "The implication behind this argument is that the officers should have departed without talking to Sheid (the second person) because talking to Sheid increased the danger to the officers. Vance's argument is without merit. Law enforcement officers are not required to avoid danger." 53 F.3d at 222. The Court cited United States v. Antwine, 873 F.2d 1144, 1147 (8th Cir. 1989), when it stated, "Exigent circumstances exist, however, when law enforcement officials have a 'legitimate concern for the safety' of themselves or others." The Court continued, "Thus, '[w]hen there is a reasonable fear of harm, a warrantless entry may be justified" citing United States v. Williams, 633 F.2d 742, 744 (8th Cir. 1980), and other cases.

In United States v. Hill, 730 F.2d 1163 (8th Cir. 1984), police officers had a warrant to search for marijuana growing outdoors on the premises and observed a weapon in the living room of the

home through a sliding glass door.  The Court held, "Under these circumstances, we hold that the entry into the living room to locate Hill was justified to protect the officers commissioned to execute the search warrant on the property surrounding the house."  730 F.2d at 1170.  The Court continued that the items of evidence from the living room which were observed in plain view during that lawful entry could subsequently be seized as contraband and evidence of criminal activity.  Other cases in which warrantless entries into homes were approved based on the officers' view of contraband through a window include: United States v. Taylor, 90 F.3d 903 (4th Cir. 1996); United States v. Beaudoin, 362 F.3d 60 (1st Cir. 2004).

Deputy Holloway thought it would be more dangerous to leave Prince Black in the home with the pistol on his chest than to go in and remove the pistol and arrest the defendant.  Holloway knew that Black had been convicted of felonies and it was reasonable to assume while he was sleeping an opportunity presented itself to seize the weapon and Black with less danger to the officers and the public than to take a chance on how Black would react if he were to awake and find officers on the premises.  This was the same Prince Black who three days before had fired at drug customers as they drove away.  It was reasonable to assume that since Black slept with the pistol at readiness, he would not hesitate to use it.

In United States v. Hill, 430 F.3d 939 (8th Cir. 2005), officers arrested Hill as he was taking out the trash.  A detective observed a woman later identified as Hill's wife and another man standing in the entry way of the residence.  The detective watched the man look outside the house at the law enforcement officers and then run back into Hill's residence.  The detective pulled open the door to the entry way where Hill's wife was standing and asked who else was in the house.  She replied that no one was there, which the detective knew was untrue.  The detective then drew his gun and quickly

entered the house and found the identified man flushing the toilet in the bathroom. He removed the man from the bathroom and placed him in the hallway. In the hallway, the detective could see a shotgun leaning against a wall at the bottom of a stairway. Other officers entered to conduct a protective sweep to make sure no one else was in the home. The detective located a handgun in plain view on the night stand in the same downstairs room as the shotgun. Other officers found other weapons and ammunition leaning against a hall closet wall in plain view. Hill was indicted and filed a motion to suppress, arguing that the evidence against him was obtained in violation of his Fourth Amendment right to be free from unreasonable searches of his home. The motion to suppress was denied on the basis that the search of Hill's home was justified by exigent circumstances, that the detective had a legitimate and reasonable concern for the safety of Hill and the officers present and, therefore, exigent circumstances justified the entry of Hill's home. The detective said he would not have entered the house if he had not seen the unidentified man running back inside the residence. Hill had allegedly been involved in an aggravated robbery. The officer assumed that there may have been weapons in the residence and was concerned that the unidentified man could have been going for a weapon. The detective testified that the sole reason for entering the residence was to ensure officer safety and the safety of Mr. Hill. The Eighth Circuit Court of Appeals held that the detective's warrantless entry into Hill's home was justified due to exigent circumstances and that once inside the officers could lawfully seize the firearms located in plain view inside the residence. 430 F.3d at 942.

In United States v. Burgos, 720 F.2d 1520 (11th Cir. 1983), the existence of a stash of weapons provided exigent circumstances for the warrantless entry into a home. Federal agents had information that a suspect had been illegally purchasing firearms for seven months. The agents saw that suspect pick up guns and transfer two large boxes of weapons to Defendant Burgos's car. They

then observed Mr. Burgos carry them into his home. The Court found that "These collective facts would lead a reasonably cautious person to believe that the search would uncover evidence of a crime. There was probable cause to enter Mr. Burgos's home." The Court continued that a warrantless entry must be justified not only by probable cause but also by exigent circumstances. The Court found that "exigent circumstances" refers to a situation where the inevitable delay incident to obtaining a warrant must give way to an urgent need for immediate action. The Court found that will be the case when resort to a warrant might endanger the police or the public. The Court found in this case that the exigencies of the situation made the warrantless entry imperative. The agents had observed the transfer of two large boxes filled with arms to Mr. Burgos. Agents had observed Mr. Burgos enter his home and get help from an unknown man in unloading the boxes. The Court found that the agents were faced with a house laden with arms and an unknown number of people inside and that the officers could reasonably believe that the household was an arsenal. The Court found that the threat of injury to the neighborhood and arresting officers justified the avoidance of delay involved in obtaining a warrant. Quick action increased the likelihood that no one would be injured. Echoing Warden v. Hayden, supra, the Eleventh Circuit concluded, "Only by entering the house and searching for persons and weapons could agents have control of all weapons which could be used against them or to effect an escape. The societal costs of delay outweighed the social interest in resort to a neutral magistrate in this instance. The exigencies of this situation made the warrantless entry lawful." 720 F.2d at 1526.

The language above used by the Eleventh Circuit has direct application to the factual circumstances involving Prince Black.

The court finds that exigent circumstances of danger to the officers and the public justified

the entry into the home by Holloway and Coleman.

### Did the Police Create the Exigent Circumstances?

It is the defendant's further position that even if there were exigent circumstances, that exception to the warrant requirement was not available to the police because they created the exigent circumstances by failing to obtain a search warrant or an arrest warrant.

On the contrary, the exigent circumstances were caused by the defendant, a known violent felon, sleeping with a pistol on his chest which it would be reasonable for police to assume was on his chest so that it would be available to take action at a second's notice.

The court has already considered the defendant's argument that the police should have left the premises, "backed off" and obtained a search warrant. As noted earlier in the Vance case, Vance argued that the officers could have eliminated all of their safety concerns simply by leaving the area. The Court of Appeals for the Eighth Circuit continued that the implication behind that argument is that the officers should have departed without talking to the suspect. The Court held that Vance's argument was without merit and stated, "Law enforcement officers are not required to avoid danger." 53 F.3d at 222 n. 4.

### Jacqueline Grant's Consent to Search

The defendant's next argument in favor of suppression of the evidence found in the apartment of Jacqueline Grant, other than the pistol on Mr. Black's chest, is that Jacqueline Grant's consent was not voluntary under the totality of the circumstances. In his post-hearing memorandum, the defendant did not further specify what the circumstances were which he feels invalidated the written consent to search signed by Jacqueline Grant.

Jacqueline Grant (also called Jackie) testified that before she signed the consent to search,

Agent Becker told her, "We have a warrant to be in your house." (Tr. I, p. 85, 100). She continued that the Chief of Police said, "I have a consent to search, Jackie, all we want you to do is sign the consent to search giving us consent to search."   Id.

At about the time of the incident, February 20, 2008, Jacqueline Grant was working with Ryan Becker as a confidential informant concerning drug transactions. (Tr. I, p. 87). She had also worked with Deputy Eddie Holloway. Her previous contact with Becker was friendly. Becker never threatened her. She testified the Chief asked her to go ahead and cooperate and sign the consent to search form giving them permission to search the house.[4] When asked if she felt she was cooperating voluntarily or not, Ms. Grant replied, "Well, I wouldn't say voluntarily." She added that when she saw Ryan Becker in there, and she knew the officers knew her, "I think that's why I just went on ahead and was like go ahead." (Tr. I, p. 100-101).

When shown the consent to search form, Government's Exhibit #2, at the first evidentiary hearing, Jacqueline Grant acknowledged that it has her signature at the bottom of the form and that at the top of the form are statements describing her rights in connection with a search. Ms. Grant acknowledged that she placed her initials next to each of those statements. She admitted that she read the statement toward the bottom of the printed form, that the consent had been given voluntarily without promises, threats, coercion or force of any kind whatsoever, before signed the form. She testified that she did not say she was forced to sign, "But I said being that I knew Ryan and worked with Ryan, I just went on ahead and just complied with what they wanted and just let them do it."

---

[4]The Chief denied he had any conversation with Jackie Grant before he left to answer a call about a fight at the city library. Approximately forty minutes later he returned. The officers were then engaged in the search. On his return to Ms. Grant's apartment, he did not mention anything about a search warrant to Ms. Grant. (Tr. II, pp. 18-19, 27).

(Tr. I, p. 102). When asked if she understood that she could say no, Grant replied, "No, sir. I thought it would be best to just go ahead and let them do what they came to do." She testified that she felt they were going to search her house one way or another. She testified that she believed the officers had a warrant.

At the end of the testimony on the date of second hearing, ATF Agent Ryan Becker was recalled by the court. (Tr. II, p. 62). When asked if what Jackie Grant testified that he told her he had a search warrant was not true, Agent Becker responded, "That is not true. I did explain to her, sir. She may be confused because I did explain to her that we could apply for a state search warrant or a federal search warrant in this case but I did not tell her that we had a search warrant." Later on, Agent Becker stated, "I did explain to her at that time that if she didn't want to give consent, that we could apply for a state or federal search warrant." When asked if he told Jacqueline Grant that a search warrant would be issued, Agent Becker responded, "No, sir." (Tr. II, p. 62-63).

Juliet Grant testified she had asked the officer she met at the door to Jackie Grant's apartment if he had a warrant to come into the apartment, and the officer replied, "he didn't need no warrant." (Tr. II, p. 9).

Ms. Jacqueline Grant's testimony is in direct contradiction to that of ATF Agent Ryan Becker. Becker testified that before he and Ms. Grant went into the home, Becker asked Ms. Grant for consent to search her apartment. In response, Jacqueline Grant said yes. (Tr. I, p. 36). Becker testified that Ms. Grant was not detained in any way. She was not handcuffed. She was not searched, and she was not arrested at the end of the search of the home. Becker testified that Jacqueline Grant signed the bottom of the consent to search form and initialed each of her rights to either accept or refuse the search on the top half of the form. He read each of the rights to Ms.

Grant, and she read them herself. She did not indicate she had any questions about her rights. She did not indicate she was unwilling in any way for the search of her apartment to take place. No officer had his gun drawn during this conversation. When asked what the tone of voice was between himself and Ms. Grant, Becker responded, "We were just sitting at her, I guess it would be a living room table.... and we were just discussing the form, and I was explaining it to her that, you know, we would like to have consent." (Tr. I, p. 38).

At the same time that she consented to the search, Ms. Grant gave a written statement to the officers in her own handwriting, Government's Exhibit #4. (Tr. I, p. 39-40). Ms. Grant's giving the written statement would seem to indicate cooperation with the officers. In her statement, Ms. Grant admitted seeing various weapons and ammunition in her apartment saying none of them were hers. She described a sale of a pistol which took place on February 17, 2008. She wrote that the big black bag was found in her living room belonged to Prince Black. At the first motion hearing, Ms. Grant testified that she did not know there were any weapons or ammunition in her house, contrary to her written statement given to Agent Ryan Becker.

The court has already indicated that it considers the testimony of Jacqueline Grant at the motion hearing suspect and has found the testimony unreliable.

As stated by the defendant, the voluntariness of a consent to search or involuntariness of the consent is dependent on the totality of circumstances. Schneckloth v. Bustamonte, 412 U.S. 218 at 227, 93 S.Ct. 2041 (1973). Factors that should be considered in determining voluntariness include: (1) knowledge of the constitutional right to refuse consent, Schneckloth, 412 U.S. at 227; (2) age, intelligence, education and language ability, Id. at 226; (3) the degree to which the individual cooperates with the police, United States v. Saenz, 474 F.3d 1132, 1137 (8th Cir. 2007); (4) the

individual's attitude about the likelihood of the discovery of contraband, United States v. Hathcock, 103 F.3d 715, 720 (8th Cir. 1997); and (5) the length of detention and the nature of questioning including the use of physical punishment or other coercive police behavior, Schneckloth, 412 U.S. at 226; United States v. Bradley, 234 F.3d 363, 367 (8th Cir. 2000).

Considering the factors listed above, Jacqueline Grant was familiar with her constitutional rights and criminal law. She had been convicted of three felonies. The consent to search listed her rights in connection with a consent to search, the first one being that she understood that she had a right to refuse to give her consent to a search and that she could demand that a search warrant be obtained prior to any search of the person or property; it is clear that Ms. Grant had the intelligence and language ability to give her consent or withhold her consent to search; according to Agent Becker, Ms. Grant agreed to the search prior to going into her home and then once inside the home and sitting at a table, she reviewed with Agent Becker what her rights were in connection with the consent and initialed those rights and signed the consent to search; a further indication of her cooperation with the police was her giving her written statement; in that written statement Ms. Grant expressed a knowledge that the contraband would be discovered since she stated in her written statement, "None of the guns or ammo that were in this house (mine) belonged to me" (Gov. Ex. #4); the conversation between Ms. Grant and Agent Becker appears to have been friendly and it does not appear that Ms. Grant was detained; there was no indication of use of physical punishment or other coercive police behavior.

The court finds that from the totality of circumstances that the consent to search given to Agent Becker by Jacqueline Grant was voluntary and given with full understanding of what the consequences would be. As a result, contraband seized during the search (see Government's Exhibit

#3) was lawfully seized and is admissible in evidence.

## Prince Black's Statements

Finally, the defendant, in his memorandum, argues that the statements obtained from the defendant were made while he was in custody, were involuntary and were obtained in the absence of Miranda warnings.

Before Jacqueline Grant arrived at the apartment, Agent Becker asked Prince Black if he would give permission to search the apartment "and Prince said that it wasn't his apartment, it was Jackie's, and I'd have to speak with Jackie. He then made the statement that anything inside was his, and Jackie didn't know anything about it." (Tr. I, p. 43). Agent Becker was then asked at the hearing whether he had asked any question to obtain an answer, such as the one Mr. Black gave, or any question at all? Becker responded, other than asking him for consent, "No." In response to questioning, Becker stated he had no other conversation with Black from the time he asked for Prince Black's consent to search and the time that Prince Black made that statement:

> Q Any other words spoken by you at all?
>
> A No."

Id.

The court finds that Prince Black's admission that anything inside was his and Jackie did not know anything about it was not made in response to questioning. It was a volunteered statement and, thus, no Miranda warnings were required. Miranda warnings need only be given when a suspect is both in custody and being interrogated. Illinois v. Perkins, 496 U.S. 292, 297 (1990). The defendant's volunteered statement was not in response to interrogation.

## Summary

In summary, the court finds that Deputy Holloway and Officer Coleman were able to see through the window in the front door of Jacqueline Grant's apartment and observed the defendant lying on a sofa with a pistol resting on his chest. The entry of the officers into the apartment without a warrant was under an exception to the warrant requirement, namely, exigent circumstances. The consent to the search of Jacqueline Grant's home by Jacqueline Grant was voluntary. Prince Black's statement that anything inside the apartment was his and that Jackie didn't know anything about it was a volunteered statement and is admissible in court.

The court finds that any physical evidence seized from the defendant's person or possession or found in Jacqueline Grant's apartment on February 20, 2008, was legally seized and is admissible in court.

**IT IS, THEREFORE, RECOMMENDED** that Defendant's Motion to Suppress Evidence and Statements (Document #19) be denied.

The parties are advised that they have eleven (11) days in which to file written objections to this Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1), unless an extension of time for good cause is obtained, and that failure to file timely objections may result in a waiver of the right to appeal questions of fact. Thompson v. Nix, 897 F.2d 356 (8th Cir. 1990).

LEWIS M. BLANTON
UNITED STATES MAGISTRATE JUDGE

Dated this 31st day of October, 2008.